UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMARCUS MASSEY,

    Plaintiff,

v.

MARSALIS TURNER,

    Defendant.

Case No. 22-11041
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17]**

Detroit Police Officer Marsalis Turner arrested Lamarcus Massey after responding to a report about a disturbance at the apartment complex where Massey worked. Massey was in a physical altercation with his manager when Turner and his partner, Officer Cassidy Hiller, arrived at the scene. Within seconds of arriving, and without giving any verbal warnings, Turner swung Massey to the ground. While attempting to place Massey in handcuffs, Turner proceeded to jerk Massey's right arm in an "unnatural" way multiple times until he heard a "pop," which was the sound of Massey's elbow breaking. (ECF No. 22, PageID.561.) Massey filed this suit alleging Turner used excessive force while restraining him.

Following discovery, Turner moved for summary judgment on qualified immunity grounds. For the reasons explained below, the Court denies Turner's motion.

## I. Background

As Turner seeks summary judgment, the Court accepts as true Massey's version of the events to the extent they diverge from Turner's. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

On November 30, 2021, Lamarcus Massey was working as a security guard for Eagle Security, which assigned Massey to the Town Residence Apartment Complex. (ECF No. 17-6, PageID.142.) Massey was the "key master for renovations," meaning he was "to take contractors around and let them into different residences and then make sure the door was locked once the contractor was done with a particular project." (ECF No. 17-8, PageID.266.) At the time, Sharee Riley was the assistant property manager or community manager at the apartment complex, and Eric Porter was Massey's supervisor with Eagle Security. (*Id.* at PageID.263–264.)

Massey says that he had an uneventful day at work until he returned to the lobby around 6:00 p.m. after doing his rounds. (ECF No. 17-6, PageID.150–151.) At that time, he was abruptly confronted by Riley and told he was being terminated for disorderly conduct. (*Id.*) Massey testified that while this made no sense, he asked to collect his things (his juice bottle and phone charger) from behind the front desk. (*Id.* at PageID.153–55.) An altercation subsequently ensued between Massey and Porter. (*Id.* at PageID.158.)

Riley presented a slightly different version. She testified that earlier in the day she asked Massey to leave after receiving complaints about him from residents and witnessing him leave the complex during working hours. (ECF No. 21, PageID.483.)

When he refused to turn over the master keys and leave the lobby after multiple requests, she called his manager, Porter, who arrived minutes later. (*Id.*) A "scuffle" then ensued between Porter and Massey. (*Id.*) According to Riley, Porter asked Massey to return the company security jacket he was wearing. (*Id.* at PageID.484.) When Massey refused, Porter forcibly removed it from Massey's body. (*Id.* at PageID.485.) Massey testified that he was hazy about the altercation with Porter and what came after. (ECF No. 17-6, PageID.160–161.) Massey was ultimately charged with assault and battery for the scuffle with Porter, but the charges were dismissed when Porter failed to appear for the preliminary examination. (*See* ECF No. 17-15.)

At some point during the scuffle, two calls were made to the police, apparently by then-assistant manager Lovie Sparks. (*See* ECF Nos. 17-9, 17-10.) The initial call occurred at 5:36 pm. (Audio Ex. D, 911 Recording #1, 0:05–0:07; *see* ECF No. 16 (Plaintiff's motion for leave to file media exhibits, granted by the Court with text-only order).) Sparks reported a disturbance and told the dispatcher that Massey was refusing to leave the property despite repeated requests. (Audio Ex. D, 0:22–0:30.) The second call was made at 5:44 pm. (Audio Ex. F, 911 Recording # 2, 0:06–0:09; *see* ECF No. 16.) This time, Sparks reported that Massey was physically fighting with another member of the staff and that he was possibly under the influence of something. (Audio Ex. F, 0:25–0:43.) She also noted, however, that Massey did not have any weapons. (*Id.*) The dispatch report for the initial call states: "MALE IS REFUSING TO LEAVE LOCATION . . . UNK[NOWN] WEAPONS." (ECF No. 17-10, PageID.287.) After the second call, the dispatch report was updated to include a

3

notation that "MALE FIGHTING WITH STAFF. . . NO WEAP." (*Id.*) Turner testified that dispatch told him there was a disturbance and a fight going on and that Massey was potentially intoxicated. (ECF No. 22, PageID.545.) Turner's partner, Hiller, testified that the only information she recalled receiving from dispatch was that there was "a disturbance" and that "two men [were] physically fighting in the lobby of the location." (ECF No. 23, PageID.624.)

Body camera footage from both Hiller and Turner captured the encounter at issue in this case. The footage shows the officers arriving at the apartment complex and immediately entering. They reached Massey and Porter within approximately fifteen seconds of arriving. (Video Ex. H, Officer Turner Body-Worn Camera, 0:41–0:57; Video Ex. I, Officer Hiller Body-Worn Camera, 0:35–0:49; *see* ECF No. 16.) As Turner approached Massey and Porter, an apartment staff member pointed out Massey. (Video Ex. H, 0:50–0:55.) Turner called out "police," and Massey, apparently surprised by their presence, can be heard responding, "police? What?" (*Id.* at 0:50–0:59.)

Turner testified that he grabbed and pulled Massey away from Porter and that Massey began pushing and struggling with him. (ECF No. 22, PageID.555.) At this point, says Turner, he "grabbed" and "swung [Massey] around, and at the time [Massey] was off balance," and Turner took "him to the ground in like an arm-bar type thing." (*Id.* at PageID.556.) Turner then clarified his testimony, stating, "I'm sorry, I don't want to say arm bar, but more of where I grab him and we go to the

4

ground together." (*Id.*) For his part, Massey testified that he never "resisted" Turner or Hiller and never "pushed" them. (ECF No. 17-6, PageID.212.)

Turner took Massey down to the ground with Massey's chest facing down. (ECF No. 22, PageID.557.) Turner then "got on top of [Massey], [and] placed [his] knee in [Massey's back] . . . to gain more control." (*Id.*) While Turner was on top of Massey's back, Hiller got down on Massey's legs, "crossed his ankles over each other[,] and . . . [put her] hands on his legs." (ECF No. 23, PageID.635.)

Once he had Massey on the ground, Turner attempted to bring Massey's right arm behind his back to be handcuffed. (Video Ex. H, 1:00–1:03.) Turner acknowledged he was pulling the arm in an "awkward and unnatural position," or in a way that Massey's arm "doesn't naturally move." (ECF No. 22, PageID.561.) After Turner jerked Massey's arm several times, it snapped or popped. The sound is captured on Turner's bodycam. (Video Ex. H, 1:00–1:07.) Massey immediately said "Ow!" and Turner said "Jesus, did I just do that?" (*Id.*) Turner also apologized. (*Id.*)

Turner testified that after Massey's elbow popped, the struggle and resistance ended, Massey's arm loosened up, and Turner "brought the arm back in the proper way" and handcuffed him. (ECF No. 22, PageID.562–563.) Massey was taken to Detroit Receiving Hospital by the officers, where he was initially diagnosed with a sprained elbow. (ECF No. 17-13, PageID.377.) But later scans showed Massey had "[s]ubacute olecranon process fracture," which required elbow surgery. (ECF No. 17-14, PageID.423; ECF No. 17-6, PageID.193, 195.)

In time, Massey sued Turner alleging he was liable for excessive force. (ECF No.1, PageID.4.) Turner now moves for summary judgment on the ground that he is entitled to qualified immunity. (ECF No. 17.) Given the adequate briefing and record, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II. Standard of Review

Federal Rule of Civil Procedure 56 provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Or, stated less formally, Turner is entitled to summary judgment only if no reasonable jury could find in favor of Massey. *See Anderson*, 477 U.S. at 251–52.

## III. Excessive Force

Massey's complaint alleges two incidents of excessive force: (1) the takedown and (2) the fracturing of his elbow. (ECF No. 1, PageID.5.) But in his response to Turner's motion, Massey says the case is not about the force used to take him to the ground. (*See* ECF No. 26, PageID.751 (stating "this case is not about Defendant Turner's decision to throw Plaintiff to the ground. . . . The altercation that amounted to Turner's presence here has no bearing on whether Plaintiff posed a threat when Turner excessively handcuffed him.")) Thus, the Court will only consider whether

6

Turner used unconstitutional force when he fractured Massey's elbow while handcuffing him.

Qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). There is a two-pronged inquiry for analyzing qualified immunity claims. First, the Court "must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, . . . the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing Fed. R. Civ. P. 12(b)(6), 12(c), 50, 56).

Whether Massey's excessive-force claim is analyzed under the Fourth or Fourteenth Amendment, the standard is the same. *See Malory v. Whiting*, 489 F. App'x 78, 81 (6th Cir. 2012) ("The Sixth Circuit has explained that '[t]he Fourth Amendment of the United States Constitution protects a person from being subjected to excessive physical force during the course of an arrest, a booking, or other police seizure.'" (citing *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009))); *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (holding that in the wake of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "a pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process

Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment").

## A.

Starting with the first prong of qualified immunity, "[t]o prevail on an excessive force claim, a pretrial detainee must show 'that the force purposely or knowingly used against him was objectively unreasonable.'" *Cretacci v. Call*, 988 F.3d 860, 869 (6th Cir. 2021) (quoting *Kingsley*, 576 U.S. at 397). In addition to the level of force used, courts consider other factors to determine if such force was objectively unreasonable under the totality of the circumstances, including the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; the severity of the security problem at issue; and the threat reasonably perceived by the officer. *See Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 530 (6th Cir. 2018); *Hale v. Boyle Cnty.*, 18 F.4th 845, 852 (6th Cir. 2021). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Hanson*, 736 F. Appx at 530 (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).

Although Turner's bodycam supports that he was not intending to harm Massey, a reasonable jury could find that the force used against Massey was excessive based on these factors. *See Graham*, 490 U.S. at 397 (explaining that, when analyzing excessive force claims, "the question is whether the officers' actions are 'objectively

8

reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation").

First, Massey was arrested on an assault and battery charge due to being engaged in a physical scuffle with his manager when the officers arrived at the scene. This weighs in favor of some use of force against him.

But little suggests that Massey posed any significant threat to the officers. He did not even know they were there until Turner was already upon him. At that time, according to the bodycam video, Massey was pinned against the wall by Porter, who was much larger than him. (Video Ex. H, 0:49.) Also, nothing in the video suggests that Massey was told he was under arrest or commanded to put his hands behind his back before Turner took him down and ultimately fractured his elbow.

The video also supports that Massey put forth little resistance. Start with the takedown. Turner contends that Massey pushed or swung away from him before or during the take-down. Massey disputes this. He testified that at no point did he resist or push the officers. The video evidence is unclear as to whether Turner spun Massey around when separating him from Porter or whether Massey initiated the spinning. What is more, the video evidence does not show Massey exerting any physical force or active resistance against the officers once he was on the ground—indeed, it would have been difficult for him to do so with Turner's knee to his back and his legs held down by Hiller. *See generally Browning v. Edmonson Cnty., Kentucky*, 18 F.4th 516, 527 (6th Cir. 2021) ("[W]e noted that active resistance generally means: physical struggles with police, threats toward officers, refusal or resistance to being

9

handcuffed, and erratic or irrational behavior." (citation omitted)); *LaPlante v. City of Battle Creek, Michigan*, 30 F.4th 572, 579 (6th Cir. 2022) ("We have held that mere noncompliance is not active resistance." (quoting *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017))).

More significant, even Turner appears to acknowledge that any resistance from Massey in withholding his right arm was because Turner was pulling it in an unnatural way—in a direction his arm physically could not go without breaking. In other words, a jury could conclude that Massey did not actively resist being handcuffed. Rather, his arm simply could not move in the direction Turner was pulling it. And this ultimately resulted in a significant injury.

The Court finds guidance in another factually similar excessive force case from this district where summary judgment was denied, *Tucker v. Brooks*, No. 19-12514, 2022 WL 1547758, at *7 (E.D. Mich. May 16, 2022). The defendant there was a police officer responding to the scene of an alleged domestic violence and child abuse situation. *Id.* When the defendant arrived at the home, plaintiff fled out the back door. *Id.* A chase ensued that resulted in the defendant "taking [plaintiff] down." *Id.* And once plaintiff was down "with [defendant's] knee on his back, [defendant] took [plaintiff's] arm, bent it 'chicken wing-style' until there was an audible pop, and handcuffed [him] causing him to scream in pain. *Id.* at *8. The court found that while the severity of the crime weighed in favor of the defendant, because the plaintiff was not an immediate threat and was not actively resisting arrest once he was taken down, qualified immunity could not be granted as a matter of law. *Id.*

10

So too here. However unintended, a reasonable jury could find that Turner's repeated jerking of Massey's arm, after he was subdued, and until his elbow fractured requiring surgery, was objectively unreasonable force. *See Smith v. City of Troy, Ohio*, 874 F.3d 938, 945 (6th Cir. 2017) ("A reasonable juror could conclude that, in pulling his arm away, Smith's resistance was minimal and that Osting's response in taking Smith to the ground was excessive."); *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) (finding plaintiff did not resist arrest where she was never told she was under arrest, and noting that "[t]he mere fact that she crossed her arms after Officer Miller tried to leg sweep her does not create a presumption of actively resisting arrest that would justify Officer Miller's actions"); *Richards v. Cnty. of Washtenaw*, 818 F. App'x 487, 492 (6th Cir. 2020) (denying summary judgment where an officer took the plaintiff to the ground twenty-five seconds after arriving, with no warning, and caused a head injury when plaintiff was not assaulting or physically intimidating the victim, was pulling away from the victim, and posed no threat to the officers).

## B.

As to the second qualified immunity prong, the Sixth Circuit's "prior opinions clearly establish that it is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented.'" *Richards*, 818 F. App'x at 493 (citing *Meirthew v. Amore*, 417 F. App'x 494, 499 (6th Cir. 2011)); *see also Harris v. City of Circleville,* 583 F.3d 356, 367 (6th Cir. 2009*)* ("Under this circuit's existing case law, there undoubtedly is a clearly established legal norm precluding

11

the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others."). And sufficient case law demonstrates that fracturing an arrestee's elbow while attempting to handcuff him, whose only resistance appears to be caused by his inability to move his arm the way the officer wants him to, constitutes excessive force. *See Meirthew*, 417 F. App'x at 495, 499 ("The video recording demonstrates some level of resistance by Meirthew when she was placed against the booking room wall. However, the level and form of resistance is disputed and cannot be deciphered clearly from the video . . . . Because it was clearly established that the use of significant force in response to passive resistance may constitute excessive force, and because Meirthew posed no safety threat, Amore is not entitled to summary judgment based on qualified immunity."); *Solomon,* 389 F.3d at 175 (6th Cir. 2004) (finding officer acted with excessive force when "without directing Solomon to act, he yanked her arm behind her with such force that it fractured"); *Tucker*, 2022 WL 1547758, at *7 ("In the Sixth Circuit, if an officer's takedown and handcuffing results in breaking the suspect's arm, this can be considered excessive force that the suspect had a constitutional right to be free from." (citing *Solomon*, 389 F.3d at 175)); *Zantello v. Shelby Twp.*, 277 F. App'x 570, 574 (6th Cir. 2008) (finding genuine issue of fact on excessive force where plaintiff engaged in violent crime but did not resist or attempt to evade arrest, officers twisted his arms, and plaintiff suffered torn rotator cuff); *Wilkerson v. Warner*, 545 F. App'x 413, 430 (6th Cir. 2013) ("[A] reasonable jury could believe that Officer Warner's alleged actions in aggressively pulling plaintiffs' arms backward, marching her out of the

hallway, and pushing her into the wall, all resulting in a re-aggravated shoulder injury requiring physical therapy, were excessive when . . . she posed no immediate threat of safety . . . and she did not attempt to escape and did not actively resist arrest.")

Accordingly, at this stage and construing the facts in the light most favorable to Massey, Turner is not entitled to qualified immunity on Massey's claim that Turner used excessive force while handcuffing him.

## IV. Conclusion

For the foregoing reasons, Turner's motion (ECF No. 17) is denied, and Massey may proceed with his excessive force claim (Count I) against Turner.

SO ORDERED.

Dated: September 30, 2023

> s/Laurie J. Michelson
> LAURIE J. MICHELSON
> UNITED STATES DISTRICT JUDGE